IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 3, 2020

IN RE DANIEL B. JR. ET AL.

Appeal from the Juvenile Court for Anderson County
No. J32503, J32504       Brian J. Hunt, Judge

_____

No. E2019-01063-COA-R3-PT

_____

A mother appeals the termination of her parental rights to her children. The juvenile court determined that there were five grounds for terminating the mother's parental rights and that termination of her parental rights was in the children's best interest. Because the record contains clear and convincing evidence to support both the grounds for termination and the best interest determination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

Mark Pienkowski, Knoxville, Tennessee, for the appellant, Donna W.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

On January 4, 2018, the Department of Children's Services ("DCS") petitioned the juvenile court for temporary legal custody of the twelve- and six-year-old children of Donna W. ("Mother") and Daniel B. ("Father"). At the time, Mother was homeless, and Father was "unavailable," having temporarily left the state with his paramour. Mother later stipulated that her children were dependent and neglected. Following a separate

adjudicatory hearing for Father, the court determined that the evidence supported a finding that the children were dependent and neglected. *See* Tenn. Code Ann. § 37-1-129(b) (Supp. 2019); Tenn. R. Juv. P. 307.

After being granted temporary custody, DCS placed the children in foster care. The court allowed Mother and Father supervised visitation and ordered them each to pay $75 per month, per child in support.

The DCS family service worker initially involved with Mother, Father, and the children would later testify that the concerns with Mother went beyond homelessness. Mother was also suspected of drug abuse and being both a perpetrator and a victim of domestic violence. A hair follicle test performed approximately 76 days after the children's removal showed that Mother was positive for methamphetamine and tetrahydrocannabinol.[1] And the children reported witnessing drug use and domestic violence between Mother and her mother ("Grandmother") and Mother and her paramour.

The first family permanency plan, ratified in February 2018, had the goal of either returning the children to a parent or for the children to be placed with a relative. With respect to Mother, the plan required her to complete parenting and domestic violence education; submit to and pass random drug screens; submit to an alcohol and drug assessment and follow all recommendations; and obtain and maintain appropriate and stable housing. The plan also required Mother to submit to a mental health assessment and follow all recommendations; work to resolve all outstanding legal issues and pay all fees and fines; provide proof of reliable, legal income sufficient to support the children; and provide proof of insurance, vehicle registration, and a valid driver's license or a transportation plan.

The court ratified two additional permanency plans. But, except for the addition of a requirement that Mother attend a batterer's intervention program in the second plan, Mother's responsibilities remained the same.

B.

On January 18, 2019, DCS petitioned to terminate the parental rights of both Mother and Father. As to Mother, the petition alleged five grounds for termination of her parental rights: abandonment by failure to support; abandonment by failure to provide a

---

[1] Tetrahydrocannabinol or THC "is a marijuana metabolite." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

suitable home; substantial noncompliance with the permanency plan; persistent conditions; and failure to manifest an ability and willingness to assume custody.[2]

At trial in May 2019, the two DCS family service workers who had worked on the case were the only witnesses. Although her counsel was present for the trial, Mother was not.

The first witness, the family service worker involved when the children were removed, testified to the efforts made by DCS to assist Mother. Mother was made aware of housing resources, including public housing, and was referred for mental health and alcohol and drug assessments that could be performed in-home. Referrals were also made for parenting education and domestic violence education that could take place in-home. And DCS conducted periodic child and family team meetings and supervised Mother's visitation with the children.

Despite the housing resources provided and discussions with Mother regarding housing options, Mother never obtained housing. To the knowledge of the family service worker, Mother only contacted one housing program, but the program could not provide assistance because it was already assisting Grandmother.

Mother did complete a mental health assessment and an alcohol and drug assessment. But she did not follow through with any of the recommendations from those assessments. Alarmingly, Mother refused to participate in drug screens after her hair follicle test. And she admitted drug use to the family service worker.

Of the requirements in the family permanency plan, Mother only fully complied with one. She maintained regular visits with the children. The family service worker described Mother's relationship with the children as "kind of odd" and that Mother had a better relationship with her younger child. According to the family service worker, "[Mother] would try, but it was like she related more or had more to do with [younger child] than she did with [older child]." Grandmother, who often accompanied Mother when she exercised her visitation, had more interaction with the older child than Mother did.

The family service worker also observed the children in their foster home, where they had been for over a year by the time of trial. The family service worker testified that the children loved the home and that they were both doing well in elementary school. The children had also confided to the family service worker that they wanted to stay in the foster home. Outside of visits, the children never inquired about their parents.

---

[2] As only Mother has appealed, we focus our discussion on the termination of Mother's parental rights.

3

The second family service worker that testified had replaced the first approximately two months prior to the trial. She had spoken with Mother the previous month while supervising Mother's last visitation with the children. At the time, Mother admitted that she was still homeless and acknowledged that she could not pass a drug screen that day. But Mother claimed that she "would try by the next visit."

The second family service worker had also observed the children in their foster home. She described the children as "very bonded to the foster parents" and "very happy" in the home. According to the family service worker, the children "love their foster parents and are ready to be adopted [by them]."

At the conclusion of the trial, the court terminated both Mother's and Father's parental rights. As to Mother, the court concluded that the evidence was clear and convincing as to all five grounds alleged for terminating her parental rights. The court also concluded that the evidence was clear and convincing that termination of Mother's parental rights was in the children's best interest.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. State statute identifies those circumstances in which the government's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2019).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights."

4

*Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

On appeal, Mother argues that the evidence does not clearly and convincingly support the statutory grounds relied on by the juvenile court for terminating her parental rights. Mother also argues that the evidence does not clearly and convincingly support the finding that termination of her parental rights was in the children's best interest.

### 1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Abandonment as a ground for the termination is defined in five different ways. *See id.* § 36-1-102(1)(A) (Supp. 2019) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned her children under the first and second definitions of "abandonment."

#### a. Failure to Support

Under the first definition, "abandonment" includes the failure "to support or . . . make reasonable payments toward the support of the child" during the four months immediately preceding the filing of the petition to terminate parental rights. *Id.* § 36-1-102(1)(A)(i). Here, because the petition was filed on January 19, 2019, the relevant four-month period is September 19, 2018, to January 18, 2019, the day before the petition was filed. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

The evidence clearly and convincingly supports this ground for terminating Mother's parental rights. The court ordered Mother to pay $75 per month, per child in child support. The record showed that Mother made a total of $100 in child support payments following the children's removal from her custody, $75 of which had been paid after the filing of the petition to terminate her parental rights. Mother made no child support payments during the four month period leading up to the petition to terminate.

Mother complains that the juvenile court did not find her failure to support was "willful" and that the "evidence at trial was insufficient to show that [she] had the ability to pay child support during the relevant four-month period." But, as DCS notes, lack of willfulness is an affirmative defense to the ground of abandonment by failure to support. Tenn. Code Ann. § 36-1-102(1)(I). The burden fell on Mother to prove her failure to support was not willful. *Id.*

b. Failure to Provide a Suitable Home

The second definition of "abandonment" considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii). Termination of parental rights may be appropriate if:

> (a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of [DCS] . . . ;
> (b) The juvenile court found . . . that [DCS] . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (c) For a period of four (4) months following the physical removal, [DCS] . . . made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that the [parent] will be able to provide a suitable home for the child at an early date.

*Id.*

A "suitable home" means something "more than a proper physical living location." *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). A suitable home requires

6

"[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at \*7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App. June 10, 2014).

We conclude that clear and convincing evidence also supports terminating Mother's parental rights on the ground of abandonment by failure to provide a suitable home. The juvenile court removed the children from Mother's custody and placed them in the custody of DCS on January 4, 2018. In removing the children from Mother, the juvenile court found both that the children were dependent and neglected and that DCS had made reasonable efforts to prevent their removal.

Although Mother argues otherwise, we have little trouble concluding that DCS's efforts to assist Mother exceeded her own efforts to establish a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]"). DCS developed a permanency plan, identified housing resources, referred Mother to the necessary service providers, and facilitated visitation with the children. But Mother took little or no action toward either obtaining a place to live or making the lifestyle changes that were necessary for her to safely parent during the four month period following the children's removal.

By the time of trial, Mother was no closer to providing a suitable home than when the children were removed from her custody. She was homeless. And she was not participating in the therapy recommended after her mental health assessment, which she did not obtain until July 6, 2018. She was also not participating in any classes for domestic violence. Just a month before trial, Mother declined to take a drug test because she told the family service worker that she would test positive for drugs. In sum, the record demonstrates little likelihood that Mother would provide a suitable home for the children in the near future.

2. Substantial Noncompliance

The juvenile court also found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). The juvenile court ratified three permanency plans, with the last being ratified on the day of trial. On appeal, Mother argues that her noncompliance with the third permanency plan cannot be a ground for termination because the court did not hold "an evidentiary hearing on its contents." She also complains that the third permanency plan was not included in the record on appeal.

7

We find both of Mother's arguments unavailing.  First, there was no requirement for the court to conduct an evidentiary hearing on the third plan.  By rule, an evidentiary hearing to ratify a permanency plan is only required under certain circumstances, none of which were present here.  *See* Tenn. R. Juv. P. 401(e).  Second, because the third permanency plan was not ratified until the day of trial, we agree with DCS that the third plan was not the basis for the juvenile court's substantial noncompliance determination.[3]

Before considering a parent's compliance with a permanency plan, the court must find that the permanency plan requirements were "reasonable and . . . related to remedying the conditions that necessitate[d] foster care placement."  Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014); *In re Valentine*, 79 S.W.3d at 547.  Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification."  *Id.*  Here, the juvenile court failed to make a specific finding that the plan requirements were reasonable and related to remedying DCS's concerns.  So our review of the reasonableness of Mother's responsibilities under the plan is de novo. *See id.*; *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *11 (Tenn. Ct. App. Jan. 31, 2020).

DCS sought removal based on Mother's homelessness, drug abuse, and domestic violence issues.  We conclude that the requirements of the plan were reasonable and related to remedying these concerns.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan.  *See In re Valentine*, 79 S.W.3d at 548-49.  We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness.  *See id.* at 547.  But whether any noncompliance constitutes "[s]ubstantial noncompliance is a question of law which we review de novo with no presumption of correctness."  *Id.* at 548.  Our concern is with the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes.  *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009).  A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance.  *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

We conclude that the evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plans.  Other than participating in visitation and submitting to a hair follicle test, Mother made no efforts to address the requirements of her plan until July 2018.  In July 2018, she completed mental health and drug and alcohol assessments.  But she did not follow any of the recommendations for treatment.  Mother declined to participate in random drug screens,

---

[3] The testimony established and the court found that the third plan did not change Mother's responsibilities.

8

and she never addressed her domestic violence issues. Mother did seek housing through one provider, but when that one provider could not assist, Mother did not pursue any of the other resources available to address her homelessness.

3. Persistence of Conditions

The juvenile court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). This ground for termination focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d at 555. So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

9

At the time of trial, the children had been removed from Mother's custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that the conditions preventing the children's safe return to Mother remained. Mother was homeless. When the family service workers attempted to test Mother for drugs after her initial positive test, she refused. And she had yet to address her issues with domestic violence.

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. Mother's admission that she could not pass a drug test just a month before trial and lack of progress on other issues made reunification in the near future unlikely.

The continuation of the parent and child relationship also greatly diminished the children's chances of early integration into a safe, stable, and permanent home. At the time of trial, the children had been in foster care for 16 months. They had bonded with their foster family and were flourishing in the care of the foster parents. And the foster parents desired to adopt the children.

4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

Finally, the court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

We conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was appropriate. DCS established by clear and convincing evidence that Mother failed to manifest both an ability and willingness to personally assume legal and physical custody and financial responsibility for her children.[4] While Mother maintained regular visitation with the

---

[4] This Court has split over the proper interpretation of the first prong of Tennessee Code

10

children, she never moved past supervised visitation. Mother had done nothing to address her substance abuse issues or her homelessness. Her domestic violence issues also remained unaddressed. Despite all the services she was offered, Mother remained unable to care for or support her children.

The evidence is equally clear and convincing that returning the children to Mother's custody would pose a risk of substantial harm to their physical or psychological welfare. Mother had no home to offer the children, and she was still abusing drugs. So we can conclude, if returned to Mother, the children more likely than not faced a real hazard or danger of harm. *See Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence

---

Annotated § 36-1-113(g)(14). *See In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11 (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's differing views on the first prong). The split concerns whether a parent must fail to manifest *both* an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest *either* an ability or willingness to assume custody or financial responsibility. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) *with In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Here, under either view, DCS met its burden of proof.

11

that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in the children's best interest. The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The juvenile court found that Mother failed to make changes in her conduct or circumstances and that lasting change did not appear possible.

The evidence supports the findings made relative to factors one and two. Mother remained homeless, jobless, and continued to struggle with illegal drugs.

The third and fourth factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court did not apply the third factor, consistency of visitation. But the court did find that there was no meaningful relationship between the children and Mother. The evidence does not preponderate against this finding.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The court found that it would be detrimental to the children to move them from their foster home. At the time of trial, the children had lived with the same foster family for sixteen months. They had bonded with the family, who had provided the only safe and stable home they had ever known. And the children's current placement is considered a preadoptive home. We agree with the juvenile court that the fifth best interest factor favored termination of Mother's parental rights.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). Mother

was homeless. And in the month before trial, she did not want to submit to a drug test because she would test positive for drugs. The juvenile court found that Mother neglected the children and abused drugs and alcohol "rendering [her] consistently unable to care for the children in a safe and stable manner."

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The court also determined that this factor favored termination. Mother completed both mental health and drug and alcohol assessments, but she refused to engage in the recommended treatment. And she was still unable to pass a drug test just a month before trial.

The ninth factor considers the parent's child support history. *See id.* § 36-1-113(i)(9). Here, Mother's failure to support her children financially also weighs in favor of terminating her parental rights.

The court is not limited to the factors listed in the statute when determining best interest. *Id.* § 37-1-113(i). In addition to the statutory factors, the juvenile court found that Mother had shown little to no interest in the children's welfare and that she continued to "make lifestyle choices which are not conducive to providing a safe and stable home for the children." The evidence also supports these findings.

In sum, we agree with the juvenile court's best interest determination. The combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's parental rights is in the children's best interest.

## III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on the five grounds presented. The record also contains clear and convincing evidence that termination is in the children's best interest. So we affirm the termination of Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

13